May it please the Court, my name is Emory Allen. I am appearing on behalf of Appellant Aguro. Your Honors, we raise two issues in our brief. One is the alleged treaty violation and secondly the... The what violation? Treaty violation. Treaty violation. The 32-year sentence violating 16 years in the District Attorney's extradition request. And secondly, the denial of the evidentiary hearing. I'd like, with the Court's permission, to start with the second issue first, the denial of the evidentiary hearing, insofar as it relates to the Bonnell plea. Mr. Aguro's allegation is that I refer to it as a Bonnell plea or waiver, however you want to term it. It's giving up a substantial amount of or a quantum of constitutional rights to submit... You used to call it the slow plea of guilty. Yes, slow plea. Yes, Your Honor, the slow plea. And, of course, Mr. Aguro's contention is that that was not a knowing, intelligent and voluntary waiver. And the District Court rejected that claim in sum on two grounds. First of all, that there was essentially that the issue could be resolved based upon the state court record. And secondly, that Mr. Aguro's declarations were not credible. That's where I would like to begin, because the District Court appears to analyze the waivers as it would any other waiver. The Court asks questions. Mr. Aguro responds. Mr. Aguro says, yes, Your Honor, no, Your Honor, yes, Your Honor, no, Your Honor. And I would like to finish by saying that, in an attempt to filter through the prism of this particular claim, our assertion is that that's inadequate. Because Mr. Aguro's contention is that due to there was a language barrier at work here, there was... What was the language barrier? He's a Japanese national, and... He lived in the United States for some years, hadn't he? Well, he needed a translator, Your Honor. Did he have a translator of the guilty plea? Yeah. He had a translator taking not a standard form plea, but a banal plea. Is there any evidence that the translation was incorrect? We have his declaration. And our position... Whose declaration? Mr. Aguro's declaration. That's not an answer. The answer is, is there any evidence that says that the translation was... That this is incorrect? Beyond the declaration, no, sir. Except that... Except what I'm about to... What I'm trying to... Is Aguro saying that the translator mistranslated the English to Japanese and the Japanese response back to English? Is Aguro saying that? Mr. Aguro is saying that he couldn't... He didn't have the opportunity, given the timing of these proceedings, to find out. He could not get access to his translator or access to his attorney. These occurred after jury voir dire. So what he's saying is, if I understand you correctly, now that I've had time to think about it, I could have used some more time to attack the translation. But that's not what I asked you. My question is, do you now produce, or did you produce in district court, any evidence that the translation was incorrect at the trial of... During the guilty plea? No, sir. His... No. No, that's correct. And the... The... The allegation is that... Okay, number one, I think the fact that he needed a translator is... Is at least evidence of a language issue. And secondly... Why? Because ordinarily they're not going to provide a translator unless a person has difficulty with a language. But he doesn't have any difficulty with a language if the translation is good. Well, the allegation is that he didn't have the opportunity. That's... In other words, he has questions of his attorney, and he's trying to ask his attorney these questions, and he's trying to go through the translator. And this is from his declaration, that the translator basically isn't giving him the time of day. And the problem here is the status of the proceedings. We're doing this essentially during jury voir dire, and he's trying to find out what does this plea mean, and he can't get the information that he needs. Now, in terms of the court, I do want to address what the court has asked about while sitting around and thinking about it. Well, that's not what happened here, because he didn't realize that he doesn't have any of his rights until after he gets into the state appellate court. Well, I may be mistaken, but I was under the impression that the plea was taken in English. The translator was not used when the plea was entered. Yes. Yes. Am I right? I believe that's accurate. So the judge was asking questions in English. Right. And he was answering in English. And he asserts that he never did understand what he was... that he never did understand the waivers. And that's not what the trial judge found. The trial judge is right there. You know, we're so many layers removed, and we've got a case where a trial judge on the scene is taking what amounts to a plea from somebody, and so he's going through this whole process. This probably has happened in the state of California 300 times this morning. They go through, they ask questions, and federal courts, this is a garden-variety plea. They go through all of this. The judge is asking him questions. He's not saying, I don't understand. He's not babbling around. He's not saying, you've got to get the translator. It just runs right down the list. Every answer is responsive to every question as I read it. And then the court at the very end of this says, I find that a girl understands and freely waives. He's sitting right there. I don't find anything at all that even remotely impeaches that. The fact that a person says yes or no, I mean, and I've seen it happen, Your Honor. How do I know you understand what I'm asking you? I mean, this is bizarre. Only a lawyer could argue this. I'm not trying to, you know, put you down, but, I mean, this is crazy. Your Honor. The trial judge asks questions, and his answers are utterly responsive, and the trial judge says, I find you understand and you're free. And the contention is that he wants to say, no, it didn't happen. If he, if one assumes, if one, first of all, if one gives credence, I would say, if one gives credence to the argument that I didn't know what he was telling me, and I was just answering the way my attorney told me to answer, then it's meaningless what he's asking him to do. The attorney isn't butting in on every one of these stages. The attorney's not whispering over his shoulder. He's answering directly questions. How can he not understand? When you get a question like this, have there any, do you understand that your sentence is going to be X? Yes, Your Honor. Have there been any other promises? No, Your Honor. Have there been any threats? No. Is this your decision to give up your right? Yes, Your Honor. He goes right through the whole thing? Your Honor, in response. Every one of his responses is absolutely responsive to what he's being asked. My response, I would like to respond to that, Your Honor, and that is that we've all practiced in the trial courts, and while it doesn't appear on the sheet, we all have been with the experience where the court asks the question. There's no evidence of that. He looks to the attorney.  This is an appellate court. We take the rhetoric. Understood. But the fact is, the fact that he makes, and I understand that the way one typically analyzes whether a plea is knowing, intelligent, and voluntary is you ask the questions in English, he responds in English. Here, he's claiming there is a language problem. If there is a language problem, the fact that he says, yes, sir, no, sir, I would submit, and it is our position, that is not dispositive of the issue. He is saying, I didn't know what was going on. If that is true, if that is true, then you can't determine whether this is a valid waiver based upon that particular litany. The judge asked him, Mr. Oguro, do you have any questions of your attorney or the district attorney or myself? And he answered, no, Your Honor. The attorney told him to keep his mouth shut. I believe that's his allegation. Because he never had his allegation is that he never had a chance to discuss what this meant. Is there a Strickland issue in here? Yes, there is. And that is what? The Strickland issue is that he did not get full and complete information, among other things, that the attorney did not properly advise him. And as a matter of fact, there's indications, again, from Mr. Oguro's declarations, but also corroborated, I believe, by the timing. I mean, pleas are not often entered during voir dire or by a break during voir dire. And we have an attorney who did not want to go to trial on this case. Now, there's a thousand reasons, of course, why an attorney didn't want to go to trial on the case. I'd like to get to your treaty violation point, because you only have four and a half minutes left. Very well. Your Honor, my point on that is that here the district attorney, we cite authority that the prosecution is required to meet its promises. Here the prosecutor said 16 years. You're characterizing, and that's not what was said. Well, what was said? That is my understanding of the extradition request was that it was two counts and that the maximum was 16 years. For what? For the two counts, the 288.5 for the child molestation cases. It said 16 years for the crime. But if you read the whole of the request, it said there were two victims. There were two counts, 16 and 16 is 32. Well, my understanding of the wording of it was that it was a representation that it would be 16 years. No. It said, pursuant to California criminal law, if convicted, the defendant will be sentenced to either 6, 12, or 16 years. That's on ER 71, paragraph 17. But then the next page says, the criminal charges were filed within seven months after the commission of the offenses, plural, paragraph 21. The victims, plural, are two female children ages 5 and 7. So two different counts. So you have to read whether you apply common law precepts of contractual interpretation or California precepts of contractual interpretation. You have to read the whole of the document. I understand that, but I didn't see anything in there that actually did the math and added it up to 32 years. But that is our position, that the request was 16 years. He might have been convicted on one count and not the other. Well. I mean, it's possible that he was innocent of one count. Well, I'm going by the letter of the request. But in any case, Your Honor, I would reserve the rest of my time for rebuttal. Thank you. May it please the Court. Gregory Ott for Respondent, appellee. Taking the issues in order. I don't usually talk about a standard of review, but I'd like to reiterate the obstacle that Petitioner here had to leap to get the evidentiary hearing he wanted. First of all, we're looking at abuse of discretion, and also when the district court was looking at the evidence before it, it had to consider the 2254 standard, which raised the bar a little higher for Petitioner. Also facing him was that the record at virtually every turn refutes or is inconsistent with Petitioner's allegations, his factual allegations and his declaration, which are even internally inconsistent at points, an example of which would be I didn't think I asked for an attorney, yet a paragraph later I didn't think these were police officers. It is so thoroughly a house of cards, each of which depends on each other, and the fact that it's refuted at every turn is itself a ground for denying the evidentiary hearing. In any event, I'd like to touch on the English issue. There was a translator, certified translator. Petitioner had worked for 16 years in management at Sony. He submitted, has submitted, two declarations in English. He initials corrections in English using English letters. There is no indication of any assistance in translation in reading and signing those declarations, and many of the answers given at the various hearings were, we testified as well, in English. He understood the questions being asked. Well, all he ever said was, yes, Your Honor, yes, or no, Your Honor. Well, Your Honor. He didn't give any information, which would show that he understood the question, so at least it's facially not inconsistent to say that he was taking instruction from his lawyer. Well, yes, Your Honor, but he also testified at the suppression hearing, and some of those statements, some of that testimony was. He testified with a translator or not? I beg your pardon? He testified through a translator? He had a translator, but some of his answers were given in English. Some of his own, how you put it, some of his own words were in English, and I think that the court, I think the trial court made note of that during that suppression hearing, so that record as well sheds some light on the other, the plea colloquy record, but the claim that I, Petitioner, didn't understand anything and was just being told what to say really requires you to accept that the entire, everything about the plea was corrupt. He was specifically asked, as you pointed out, do you have any questions of the court, your attorney? He didn't ask about the translator, and he said no. He had a translator through which he could have said, asked questions, or he could have asked them in English. He could have pointed out to the court that he was having trouble with the translator. That never happened until long after judgment. There simply was never any hint of a problem with understanding anything, the translator, the court, the attorney. He also was specifically asked, have you had the opportunity to discuss this with your attorney, the charges? He was, and in terms of his claim that, oh, well, I didn't understand. I thought I could question the witnesses. I thought I could still question witnesses even if I entered this plea. The trial court specifically told him that he had the right to confront and examine witnesses against him and told him that he was giving up that right. It couldn't have been more clear. This was a very garden-variety plea. It was very clean. The statements that he gave to police were recorded, but Petitioner's allegations require this court to virtually scuttle every aspect of the record, from the statement to police to the plea colloquy to his confession, which was an English without a translator, to police, I believe so, because I don't, unless one of the officers spoke Japanese. There were just two officers there. There was implicitly a confession to the probation officer as well as trial counsel, who said at sentencing that he has remorse and made further comments. Never a hint that Petitioner intended to challenge this in any way. If I may move on to the treaty issue. This case isn't identical to Benitez, but I think Benitez applies here as well in that there is no Supreme Court holding addressing the correlation between a sentence and a treaty. But here it's even stronger than in Benitez because in Benitez Venezuela said, put an express limitation on the extradition. Here Japan has never suggested, even post-judgment, before judgment, at any time that there was any limitation or that it was expressly relying on this application, which is very different from a negotiated extradition. This is simply an application pursuant to a treaty, and the treaty itself has a couple of express exceptions, one of which is consent. And as the state court found, there was consent in entering this plea. There was a consent that the window was 16 or the range, sorry, was 16 to 32. He received 26, and he agreed to that. So even under the terms of the treaty, consent being an exception, the claim fails. But aside from that, the context of the statement of 16 years, Japan would have understood they are not a lay reader of this agreement. They would have understood that it's 16 years each and that there was no promise, no express limitation by either party. And this statement of 16 years and explanation of the offenses was only to show that this was a felony for which he was being extradited. The context is not a promise that we, the State of California, will sentence him to no more than 16 years. If this court ---- Do you want to say anything about the tapes, the claim that the tapes were doctored? Your Honor, the ---- yes. A couple of things. There isn't any proffer on this. Now, I know it's hard to get a proffer to show that a tape that you don't have is doctored, but there's also a claim that the attorney asked for that tape. Well, that's not in the record, and there's never been an attempt to get a declaration or an assertion that we tried to get a declaration from trial counsel on that. The description of what happened is simply not credible. The state court found that he wasn't credible. The state court found that the police were credible, meaning in saying that he didn't ask for an attorney. But even aside from that, as we've argued, he wasn't in custody. If he asked for an attorney, it doesn't get him anywhere because his underlying claim was a Miranda violation, an Edwards violation. But if he wasn't in custody and he asked for an attorney, it doesn't further ---- As long as it's not a custodial holding, you think that Edwards doesn't apply? That's my reading of Edwards, that Edwards, which is an explication of Miranda, if he's not in custody, it doesn't apply. But also going to the credibility of his claim, another point that I think was pointed out by the state court is his whole claim is inconsistent about that interrogation. He says, I asked for counsel, but then he says, I didn't know these two were police, and he let them in. There are so many conflicting nuances. He says, I ---- It's tough to make out a custody claim if you don't think they're police. Right, and you're in your own home. But in sum, I think that the record is so strongly refutes the claim that the district court didn't abuse its discretion in denying an evidentiary hearing on that or any of the other hearing claims. If the court has no further questions, I would submit it on the record. Thank you. Your Honor, just a couple of comments on the Miranda claim. And on Mr. Aguro's statements in the course of this meeting with the detectives, and on the fact that he's in his own home. These guys, I beg your pardon, these detectives were going to get a statement before they left. Two of them show up, not one but two, show up at his home. Mr. Aguro can't go anywhere. He's there with his kids. I heard the court say it's a tough custody claim. He can't go anywhere. He can't, he is not. He can't go anywhere because of the kids, not because of the two cops. He's not free to leave. The cops know that. The officers know that. The officers tell him, he tells the officers to leave, and the officers don't leave. There are two of them, not one but two, show up with a tape recording. Mr. Aguro does not, I admit to a little bit of ambiguity on this particular point, because at first he thought that these were private agents sent by family members of the victims to beat him up. I think that he, from his testimony, he figured out that these were police officers, and under the circumstances I think that he probably, I think that it's a reasonable statement to think that he probably did ask for an attorney. Now, the fact, I understand the district court believed the officers when they said. The district court? I beg your pardon, Your Honor. I meant the trial court. The trial court did, in fact, believe the officers when they said, well, he never asked for an attorney. Frankly, I don't know that there's any credibility to that whatsoever. These officers got a, they came for a confession. They had a Japanese national, not real strong on English, and I know that there's a dispute there, but the fact of the matter is there was, a translator was employed. I don't think that any of these officers are going to say. Are you saying a translator was employed at the house? No, no, sir, I am not. I'm not saying that there was a translator, and I'm pretty much out of time, but the officers are not going to say that he asked for an attorney, I don't believe, in this particular circumstance. And with that, I'm prepared to submit. I just needed to make that point. Thank you, counsel. Thank you, Your Honor. The case of Aguro v. Woodruff will be submitted, and the court will stand in adjournment until tomorrow morning at 9 o'clock. Thank you.
judges: Trott, Bea, Conlon